FILED'10 MAR 15 14:14 USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ALBERT R. GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | CV-08-1422-CL |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| MICHAEL J. ASTRUE, Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

CLARKE, Magistrate Judge:

## **INTRODUCTION**

Plaintiff Albert Garcia brings this action for judicial review of a final decision of the Commissioner of Social Security denying his applications for supplemental security income payments (SSI) under Title XVI of the Social Security Act. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner's decision should be affirmed and the case dismissed.

1 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Garcia was fifty-four years old on the date of the Administrative Law Judge's (ALJ) opinion. Admin. Rec. 997.[1] He has a high school education. *Id.* at 971-972. Garcia worked as a landscaper, laborer, bench worker, and doing janitorial work. *Id.* at 192, 1001,1010. Garcia amended his onset date of disability to December 3, 2004, due to right ankle impairment, right shoulder impairment, and impairments of both knees. A hearing was held before an Administrative Law Judge (ALJ) on November 28, 2007. The ALJ issued an opinion on April 4, 2008, finding Garcia not disabled. Garcia requested an Appeals Council review of the ALJ's decision. The Appeals Council issued a decision on October 24, 2008. The Appeals found a borderline age situation since Garcia would turn fifty-five within a few months of the ALJ's decision. The Appeals Council found the higher age would make Garcia disabled and determined Garcia should be deemed disabled as of April 4, 2008, the date of the ALJ's opinion. Garcia asserts that he should have been found disabled from the date of onset, December 3, 2004.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

---

[1] Citations to "Admin. R." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

2 - FINDINGS AND RECOMMENDATION

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 416.920. At step one, the ALJ determines if the claimant is performing substantial gainful activity. If he is, the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(I).  At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement. 20 C.F.R. § 416.920(a)(4)(ii).  If the claimant does not have such a severe impairment, he is not disabled. *Id.*  At step three, the ALJ determines whether a severe impairment meets or equals a "listed" impairment found in the regulations. 20 C.F.R. § 416.920(a)(4)(iii).  If the claimant's severe impairment meets or equals a listed impairment, he is disabled. 20 C.F.R. § 416.920(d).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments.  20 C.F.R.  § 416.945; Social Security Ruling (SSR) 96-8p.

At step four, the Commissioner must determine whether the claimant retains the RFC to perform work he has done in the past.  If the ALJ determines that he retains the ability to perform his past work, the Commissioner will find the claimant not disabled.  20 C.F.R. § 416.920(f).

When the adjudication reaches step five, the Commissioner must determine whether the claimant can perform any work that exists in the national economy. *Bowen v. Yuckert*, 482 U.S. at 142; 20 C.F.R. § 416.920(g). Here the burden of production shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Tackett v. Apfel*,

180 F.3d 1094, 1099 (9th Cir. 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. §§ 416.920(g), 416.966.

## THE ALJ's FINDINGS

At step one, the ALJ found that Garcia has not engaged in substantial gainful activity since the alleged onset of disability. Admin. R. 43. At step two, the ALJ found that Garcia had severe impairments in the right ankle, right shoulder, and arthritis in both knees. *Id.* She determined, at step three, that Garcia's impairments did not meet or equal the criteria for a listed impairment enumerated in 20 C.F.R. Pt. 404, subpt. P, appendix 1 (Listing of Impairments). Admin. R. at 44. Assessing Garcia's RFC, the ALJ found he was able to perform light work with the ability to stand six out of eight hours, for thirty minutes at a time, and to sit for eight out of eight hours, at least an hour at a time. The ALJ determined Garcia must "avoid kneeling, squatting, crawling, and climbing stairs, ladders, ropes and scaffolds. . . He must avoid hazards, unprotected heights, vibration, and balancing. He must avoid repetitive overhead reaching but may reach overhead occasionally." The ALJ also determined Garcia was able to read, write, add and subtract. *Id.*

At step four, the ALJ determined Garcia had no past relevant work. *Id.* at 47. The ALJ found Garcia could not perform the full range of light work and elicited testimony from an impartial vocational expert (VE). *Id.* at 1006-1016. The ALJ asked the VE whether there were jobs an individual of Garcia's age, education, experience, and RFC was capable of performing. The VE replied Garcia could perform jobs that exist in the national economy including assembler of printed goods, bench worker, and small products assembler. *Id.* at 1010. The ALJ found Garcia could perform work that exists in significant numbers in the national economy and was not disabled within the meaning of the Social Security Act. *Id.* at 48.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)(citations omitted).

The ALJ is responsible for resolving conflicts in the medical evidence and determining credibility. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1193. The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d at 1039-1040.

## DISCUSSION

Garcia alleges the ALJ erred in determining his RFC by improperly rejecting the opinion of Dr. Solotaroff and improperly evaluating his impairments. He further alleges the ALJ erred in evaluating his credibility. Garcia argues that based on these errors, the ALJ improperly concluded, at step five, that he could perform other work in the national economy. Garcia also challenges the opinion of the Appeals Council regarding the onset of disability. He alleges the Appeals Council failed to properly address additional medical evidence, including another letter from Dr. Solotaroff which was submitted to the Appeals Council.

I.      **Medical Background**

Garcia received treatment from the Veteran's Administration Medical Center (VA) from 1995 through 2002.  Garcia had some type of wrist injury in October, 1995, and complained of ongoing pain.  Admin. R. 485-486.  X-rays, nerve conduction studies, and bone scan were unremarkable. Wrist splinting and casting resulted in a minimal decrease in symptoms.  An arthrogram revealed a triangular fibrocartilage tear, which is often post-traumatic, and sometimes due to aging.  A wrist arthroscopy with debridement was performed in the summer of 1996.  *Id.*  Due to ongoing complaints of pain, a VA anesthesist gave Garcia a pain stellate block in January, 1997.  *Id.* at 461-464.  Garcia had discrepant symptoms after the block and the physician suspected a psychosomatic overlay and recommended a medical psychiatric evaluation.  *Id.*  at 624-625.  Garcia refused treatment, such as non-steroid anti-inflammatory drugs (NSAIDS) or referral to the chronic pain clinic and instead requested narcotics.  *Id.* at 468-469, 553.

Garcia underwent another wrist arthroscopy procedure, and a Blatt Procedure in the spring of 1998.  *Id.*  at 385-405, 418-433.  He failed to follow up on appointments for hand therapy and chronic pain groups.  *Id.*  at 366, 619.  On September 30, 1998, Garcia complained of left knee pain following a step down a drop in the road.  He was observed to walk without assistance and only a slight limp.  During the exam he complained of increased pain and his limp increased noticeably. There was no swelling or effusion of the knee and he had complete range of motion (ROM) in the knee.  He was given a prescription for Tylenol with codeine.  *Id.*  at 361.  Later in the month he left the VA emergency care unit (ECU) because he could not get a refill of his pain medications.  *Id.*  at 348-349.  Dr. Rasmussen, Garcia's primary care physician (PCP) at the VA, completed a medical summary form for "court" on November 2, 1998, noting that Garcia was restricted to lifting ten

pounds with his right arm, thirty pounds with left arm, and was to do no deep knee bending or standing for more than two hours consecutively.  She noted he could stand or walk for eight hours a day with two fifteen minute breaks and a thirty minute lunch break, but could perform no basic landscaping duties.  *Id.*  at 359.

Dr.  Rasmussen's medical notes in November, 1998, noted no evidence of instability in the left knee and that Garcia could walk comfortably without limping.  She noted he declined arthrocentesis but she believed it would be the best treatment for him.  *Id.*  at 634-635.  Dr. Rasmussen noted in December, 1998, that Garcia had recurrent injuries, complaints of knee instability and drug-seeking behavior.  She declined to prescribe narcotics but ordered an MRI, an orthopedics consultation, and prescribed Naprosyn.  *Id.*  at 357-358, 633.  In January 1999, Garcia was evaluated in the Rheumatology Clinic and given a prescription for Tylenol with codeine, and a referral to orthopedics.  *Id.*  620-621.  Garcia was evaluated in the Orthopedics Clinic on February 8, 1999, and was to return following an MRI to determine if he had some medial mediscal pathology of the left knee.  No narcotic medication was prescribed, despite Garcia's request.  *Id.*  at 648.

In February, 1999, the VA Drug Seeking Behavior Committee reviewed Garcia's file and expressed concerns about excessive requests for controlled medications and non-compliance with prescribed follow-up.  The committee determined Garcia could not receive controlled medications from ECU, but had to be referred to Dr. Rasmussen.  *Id.*  at 353.  In July, 1999, Garcia had a left knee arthroscopy for a medial mediscal tear.  *Id.*  at 314-316, 325-341.  Garcia continued to complain of left knee pain a month after surgery and was given a prescription for Vicodin.  He was noted to be wearing a brace although he had been given crutches to use after the procedure.  *Id.*  at 311-313. In September, 1999, Dr.  Rasmussen noted Garcia complained of recurrent pain; was not using his

crutches; was using his brace; and requested narcotics. She offered Naprosyn, Ibuprofen, Tylenol, or Salsalate, but Garcia refused these medications. Dr. Rasmussen diagnosed chronic pain syndrome with drug-seeking behavior because of Garcia's refusal to accept other pain regimens and no improvement from surgery. *Id.* at 631-632.

In July, 2001, Garcia went to the VA ECU on May 19, 2000, stating he jumped out of a truck and jammed his right leg causing knee pain, and he became agitated when told he had to receive pain medications from Dr. Rasmussen. *Id.* at 307-308. In June, 2000, Dr. Rasmussen noted he was not wearing his knee brace; requested narcotics; refused anti-inflammatory medications; and requested a letter stating he could not work due to knee pain. *Id.* at 629-630. She noted he walked without a limp or evidence of stiffness; had full muscle strength; full ROM; and a normal knee exam. *Id.* Dr. Rasmussen refused to prescribe narcotics and found no medical reason to abstain from work. Garcia left before getting knee X-rays. *Id.* Garcia requested a new primary care physician. *Id.* at 637.

In July, 2001, Garcia had right knee arthroscopy and a right ankle evaluation under anesthesia. *Id.* at 286-303. This followed several visits where he complained of right knee and ankle pain after falling out of a truck. *Id.* at 282, 625-626. At the end of July, 2001, Garcia reported to the VA Social Work Services (SWS) that he was recovered from surgery and wanted to return to work. *Id.* at 641. Garcia was seen at a hospital in Arizona on March 15, 2002, because he had run out of Percocet which he received from the emergency room (ER) after being hit by a motor vehicle on March 7, 2002. He was given an arm sling and a refill of Percocet. *Id.* at 673. Garcia returned to the hospital five days later stating his Percocet had been stolen. His x-rays showed a displaced fracture of the right clavicle and no abnormality of the joint or additional fractures. *Id.* at 672, 674. Garcia went to the VA ECU three times in April, 2002, complaining of right shoulder, elbow, knee,

and ankle pain. *Id.* at 556-560, 657-658. His x-ray showed an intact right clavicle and the old fracture appeared to be healing well. He requested Percocet, but smelled of alcohol. *Id.* at 557.

Dr. Rasmussen saw Garcia on May 8, 2002, and noted he smelled of alcohol; had an exaggerated response to light touch of the right clavicle; full ROM of the right elbow; and no effusion or erythema in the arm. *Id.* at 627-628. She noted a normal knee exam, and reexamined x-rays from April, 2002. Dr. Rasmussen noted Garcia requested Percocet, but smelled of alcohol. She further noted no narcotics were indicated for pain, there was no evidence for pathologic etiology of pain complaints, and narcotics were incompatible with alcohol. *Id.* Garcia was seen in the VA Orthopedics Clinic On August 1, 2002, for his pain in the right knee, shoulder, scapula and ankle, and for back pain. *Id.* at 601, 651. He was diagnosed with a healing fracture in the clavicle, and diffuse pain the right knee with no evidence of fracture, meniscal tear, or ligament insufficiency. Garcia requested narcotics but was denied as he had recently quit addiction therapy. He was referred to physical therapy (PT). *Id.* Garcia went to his PT consultation and was given exercises and instructed on the home use of ice. *Id.* at 638-641. He failed to show up for his PT follow up appointment. *Id.* at 638.

Garcia went to Joshua David, a naturopathic physician from December 2002 to May, 2003, and received trigger point injections. *Id.* at 675-682. Dr. David referred Garcia to Dr. Wu, a cardiologist, because of chest pain symptoms. Dr. Wu reported Garcia walked daily, smelled of alcohol, and had a normal electrocardiogram. He suspected alcohol consumption with a history of peptic ulcer disease could be the cause of Garcia's chest pain. *Id.* at 688-689. Dr. Wu decided to arrange for a nuclear scan and started Garcia on beta-blockers and nitrogycerin to take if needed. *Id.* Dr. Wu noted Garcia did not show up for the nuclear scan and recommended he get blood work done. *Id.* at 687.

9 - FINDINGS AND RECOMMENDATION

Garcia began treatment with Dr. Lehtinen, of Providence Health Systems, on August 5, 2003. She noted he did not follow up with orthopedics after his car accident and was requesting pain medications. Dr. Lehtinen declined to provide pain medications until records came from the VA. She prescribed Cimetidine for gastrointestinal symptoms and recommended he not drink alcohol. *Id.* at 778-780. Dr. Lehtinen noted Garcia requested pain medications for his right shoulder pain on August 15, 2003, and she prescribed Tylenol with codeine. *Id.* at 776-777. A few weeks later, Garcia thought he refractured his collarbone after wrestling with his girlfriend. Dr. Lehtinen noted no symptoms in his hand, normal grip strength, the ability to move his arm, but she was unable to examine his shoulder due to pain. X-rays indicated a healed fracture. *Id.* at 775, 783-784.

Dr. Lehtinen referred Garcia to Dr. Montgomery, an orthopedic specialist. Dr. Montgomery noted on September 17, 2003, that Garcia did not drink, had no shoulder instability, and an old clavicle fracture. *Id.* at 715-716. He diagnosed post traumatic rotator cuff tendinitis, acromioclavicular (AC) joint dysfunction and post traumatic upper extremity pain. Dr. Montgomery injected the subacromial space with only minimal relief for Garcia and Dr. Montgomery noted this was a concern. He referred Garcia to PT. *Id.* Dr. Montgomery saw Garcia on October 29, 2003, and noted he only went to PT once. Garcia stated it was due to lack of insurance. Dr. Montgomery found that surgical intervention was unlikely to help Garcia's shoulder symptoms unless an MRI revealed further pathology. *Id.* at 714. Two weeks later, Garcia called the Providence orthopedic clinic and then the family clinic requesting pain medications or surgery but was told he had to wait for the MRI results. *Id.* at 714, 774.

Garcia's MRI of the right shoulder taken in November, 2003, indicated a small amount of fluid versus a small distal supraspinatus tear and slight retraction from the greater tuberosity. The fluid was determined most likely, the impression was mild right acromioclavicular arthrosis with a

small amount of fluid in the subacromial bursa. *Id.* at 709-710, 781-782. On November 20, 2003, Dr. Montgomery spoke with Dr. Dixon, a psychiatrist at St. Vincent Hospital. *Id.* at 713. Garcia was taken by police to St. Vincent after threatening suicide. *Id.* at 698-708. Dr. Montgomery told Dr. Dixon that the MRI findings did not explain Garcia's current pain symptoms. He noted he was reluctant to recommend surgery as it would likely not help all of Garcia's symptoms and Garcia would need to show improvement with his substance abuse and mental health symptoms. *Id.* at 713.

Dr. Lehtinen saw Garcia on November 24, 2003, and Garcia stated he had contacted the VA for counseling and declined Providence case management. Dr. Lehtinen prescribed a small amount of Tylenol with codeine but because of Garcia's alcohol use noted he must be willing to sign a narcotic pain contract. *Id.* at 771-773. On January 9, 2004, Dr. Lehtinen saw Garcia for right shoulder pain. She noted he denied regular alcohol use but had called her office when drunk and incoherent. *Id.* at 769-770. She also noted he failed to follow up with mental health treatment and PT. Garcia stated he lost his state insurance due to missed payments. Garcia requested a letter for disability but Dr. Lehtinen told him she was not a disability provider. She agreed to refill his Tylenol with codeine prescription if he signed his pain contract and followed up with PT and counseling when his insurance was reinstated. Dr. Lehtinen further noted that while Garcia could probably not do the physical labor of a landscaper due to his shoulder injury, he would benefit from job retraining. *Id.*

Dr. Patrick, a state agency consultant, conducted a psychodiagnostic evaluation of Garcia on July 22, 2004. *Id.* at 726-731. He noted Garcia smelled of alcohol and told Dr. Patrick he would have gone into an addiction program at the VA in Vancouver, but was not eligible right now for benefits. Dr. Patrick recommended substance abuse treatment. He noted Garcia stated he walked for a couple of hours before his knee pain bothered him; used the bus system; and did simple, light

11 - FINDINGS AND RECOMMENDATION

tasks at the shelter. Dr. Patrick found Garcia had mild to moderate impairments with understanding and remembering instructions, concentration, persistence, and the ability to engage in appropriate social interaction. However, het noted substance abuse treatment could likely improve these impairments. *Id.*

Dr. Thompson, of Providence Family Medicine, saw Garcia on October 6, 2004. He noted Garcia stated he had chronic right shoulder pain since being hit by a car and that he was recently struck by a 200 pound tool cart, which hit his collarbone and right knee. Garcia stated although he drank alcohol the previous night he was cutting down and willing to start a treatment program. Garcia stated he was out of medications and requested narcotics. Dr. Thompson refilled his nonnarcotic prescriptions, referred him to orthopedics and PT, and gave him Salsalate. *Id.* at 764-765.

Garcia went to the emergency room (ER) at Oregon Health Sciences University (OHSU) on January 25, 2005, stating he fell getting off a bus onto his hand. X-rays were negative for acute fracture, but it was noted he could have a navicular fracture, and he was advised to return in a few weeks if still in pain. Garcia was given a splint for his wrist and Vicodin. *Id.* at 792-794. He returned to OHSU on January 31, 2005, stating he had a PCP but wanted to change physicians. Garcia denied alcohol use and was given a prescription for Vicodin, a referral to orthopedics, and told to continue wearing his splint. *Id.* at 790-791.

Garcia began treatment with the Community Engagement Program (CEP) on February 10, 2005. *Id.* at 829-830, 876-877. He was noted to be a poor historian and stated his military papers were stolen and he could not get care from the VA. He was noted to be in general good health with arthritis in the knees and right shoulder, depression, and stable hypertension. His records were requested and he was referred to mental health and orthopedics. *Id.* Garcia went to the OHSU ER

12 - FINDINGS AND RECOMMENDATION

on February 17, 2005, stating he had multiple injuries and surgeries to his right wrist and requested pain medications. *Id.* at 788-790. His exam showed limited ROM but no abnormalities or deformities. He had full strength in all five fingers as well as his hand. It was noted he had two x-rays in the last three weeks for the same complaints. Garcia stated he was going to see Dr. Gillin and would be referred to orthopedics by him. He was given a prescription for Vicodin. *Id.*

Garcia returned to OHSU ER on February 27, 2005, stating he had been moving furniture, was in more pain, and requested Vicodin. *Id.* at 787-788. He was told he should have leftover Vicodin but Garcia stated he did not. Garcia had a good grip in his right hand, his sensation was intact, and he had decreased ROM due to surgeries. He was advised to follow up with his PCP and orthopedics. It was noted Garcia had been to the ER many times with the same complaints asking for pain medications. Since he stated he had an appointment with his PCP coming up he was given two Vicodin and a prescription for Naproxen. *Id.*

Garcia continued to be seen every few weeks at CEP. It was noted that he was angry at his first visit because he was not given Hydrocodone and stated he might have to return to Arizona where he could get employment and a new PCP. *Id.* at 824-826, 872-873. After reviewing his records he was given an ongoing prescription for Tylenol with codeine for his chronic pain. *Id.* at 824, 864, 866, 869, 870, 871. It was noted Garcia had a history of alcohol abuse, Hypertension (HTN), and Gastroesophageal Reflux Disease (GERD). *Id.* at 824, 871. The records noted Garcia walked without a limp, but wore a splint on his right wrist. *Id.* at 870. Garcia was referred to Dr. Balme, an orthopedist, on April 21, 2005. *Id.* at 867-868. Dr. Balme observed Garcia had no discomfort while removing and putting on his shirt, but had marked grimacing and pain behavior with manipulation of his right shoulder. Dr. Balme wanted to review the MRIs, and advised against the use of Tylenol with codeine, because of dependency issues. *Id.*

13 - FINDINGS AND RECOMMENDATION

On his visit to CEP on May 4, 2005, it was noted Garcia had a normal gait, full ROM in extremities and was not happy with the report from Dr. Balme. He was given a prescription for Tylenol with codeine and referred for an MRI of the right knee. *Id.* at 866. An MRI of the right knee on May 13, 2005, showed findings consistent with a prior meniscectomy, with lateral meniscus and tendons and ligaments intact. There was possible degenerative marrow edema with trace joint effusion. *Id.* at 918. At his follow up visits to CEP over the next few weeks, Garcia requested another orthopedics referral and declined an EKG for chest pain. *Id.* at 865. He was noted to be fully ambulatory and given a prescription for Tylenol with codeine for his chronic pain. *Id.* at 864.

Garcia was seen at the Emmanuel Bone Clinic on July 5, 2005, for an assessment. *Id.* at 908-913. He was diagnosed with subacromial bursitis and acromioclavicular osteoarthritis in his right shoulder. Garcia was noted to have ROM within normal limits, yet stated he could not carry anything heavy on his right side. It was noted that the findings from exam, X-ray and MRI showed nothing acute and it was unclear why he had such extreme complaints of pain or why he wanted surgery. *Id.* Later that evening Garcia went to the ER at Legacy Hospital complaining of injury to his right shoulder. It was noted he smelled of alcohol, and had a pain contract with his PCP. He was given five Vicodin and told he could not receive future narcotics from the ER. *Id.* at 914-916.

Garcia continued to be seen at CEP through 2005 and it was noted that the orthopedic specialists concurred the degenerative changes in Garcia's joints should be responsive to NSAIDs treatment only. *Id.* at 862-863. It was further noted that he had injuries while working, a normal gait, full ROM in his extremities, smelled of alcohol, was not compliant with his nonnarcotic medications, and continued to receive prescriptions for Tylenol with codeine. *Id.* at 860-862. Garcia returned to CEP in the summer of 2006 and was given a prescription for Hydrocodone, and a referral for another MRI of the right shoulder. Garcia stated he was unhappy with the previous

14 - FINDINGS AND RECOMMENDATION

orthopedists and wanted another referral. *Id.* at 855. On July 21, 2005, Garcia was seen at CEP for right ankle pain by Dr. Solotaroff, who noted no edema in the right ankle, with possible tendinitis. Garcia refused PT and acupuncture and requested an MRI. *Id.* at 854. He continued to receive refills for his medications and got another referral for an MRI. *Id.* at 852. On his visit to CEP on September 7, 2006, it was noted his MRI of the right ankle was consistent with his old injury with degeneration and reabsorption. Pain management was discussed as Garcia had been to various orthopedists and was always dissatisfied as they recommended NSAIDs. He was encouraged to take his Prilosec for his GERD so he could use NSAIDs and was given a prescription for Naprosyn. *Id.* at 850.

Dr. Pea, from Legacy Hospital, saw Garcia on September 25, 2006, for right lateral ankle pain. *Id.* at 899-902. He noted Garcia was hesitant to have another referral as he has seen many physicians. Dr. Pea noted Garcia was an "on and off" landscaper who worked and moved around on his feet a lot. The ROM in his foot joint was limited, suggestive of an old fracture. He noted the MRI showed a distal tibial cyst and a distal fibular fracture. Dr. Pea referred Garcia to an orthopedic surgeon, Dr. Noall, to discuss further treatment as his ankle brace did not help. *Id.*

Garcia saw Dr. Olbrich at CEP on September 29, 2006. He noted Garcia wanted a cast on his ankle and had gone to other clinics and ERs seeking a cast or splint. Dr. Olbrich noted Garcia's MRI pointed to cartilaginous injury. *Id.* at 849. The notes from CEP in the summer of 2007 indicate Garcia was seen by Dr. Noall at Emmanuel Hospital and that Dr. Noall believed Garcia's MRI showed degenerative changes consistent with arthritis. *Id.* at 844. The notes indicate Garcia walked with a cast on the right ankle; walked without difficulty with a walking boot; complained of pain in the right elbow; was unhappy with all the orthopedists; and received prescriptions for Tylenol

with codeine and Hydrocodone. *Id.* 844-848. Dr. Pedersen performed a needle biopsy on Garcia's lymph nodes in November, 2007. *Id.* at 838.

Dr. Solotaroff wrote a letter on July 27, 2007, stating she had been Garcia's physician for one month; that his biopsy needed to be repeated; and the lymphadenopathy could cause fatigue. *Id.* at 919-920. She further noted Garcia had a right ankle problem and old fracture. Dr. Solotaroff stated she had not been able to fully evaluate his upper extremity conditions. However, she stated Garcia could not sustain work, even sedentary work, due to a need to rest. Dr. Solotaroff said she was unable to state the duration of his condition until she was able to do a complete medical work up and review Garcia's records. *Id.* Over the next few months, the CEP medical records indicate Garcia complained of problems with GERD despite his medications; had some weight loss; had elevated liver function tests; was not taking his Prilosec for GERD; stated he would stop drinking; failed to follow up with visits to Legacy; and was referred to Dr. Buehler for an endoscopy. *Id.* at 841-844. Dr. Buehler found he had a fungal infection, prescribed medication treatment, and recommended an ultrasound of the liver. *Id.* at 886-889.

Garcia saw Dr. Solotaroff six times between October, 2007, and April, 2008. She noted Garcia had a right ankle brace and referred him to an orthopedist at OHSU. *Id.* at 839-840. Dr. Solotaroff prescribed a quad cane and Vicodin. *Id.* at 959. She noted Garcia did not follow up with Dr. Buehler and ordered another ultrasound of the liver. *Id.* at 958. Dr. Solotaroff noted in January, 2008, that Garcia's lymph node biopsy was negative; he was not wearing his ankle boots, and had rib pain from an assault. She prescribed Vicodin and ordered x-rays of his hips. *Id.* at 957. On a follow up visit Dr. Solotaroff noted she would seek an orthopedics referral outside of OHSU and referred Garcia to Dr. Herzka for right knee and shoulder pain. *Id.* at 956. Dr. Solotaroff noted

16 - FINDINGS AND RECOMMENDATION

Garcia's liver function tests were normal at the end of March, 2008, probably because he was no longer drinking.  *Id.*  at 955.

Medical notes from Dr. Solotaroff were submitted to the Appeals Council in 2008.  In May, 2008, Dr.  Solotaroff noted Garcia was walking with a cane; was not wearing an ankle brace; had headaches; and pain over his iliac crest.  She referred Garcia to acupuncture; noted that Dr.  Herzka had ordered an MRI for his right shoulder; and increased his Vicodin and started Flexeril.  *Id.*  at 954.  Dr.  Solotaroff noted in June, 2008, that Garcia was told by OHSU that nothing could be done regarding his right knee and ankle, so she would try to get another referral.  Dr.  Herzka was to follow up on his right shoulder as the May, 2008, MRI showed a torn rotator cuff.  *Id.*  at 32-33.

Dr.  Solotaroff wrote a letter on June 23, 2008, stating that she continued to treat Garcia on a bi-monthly basis and that he was not malingering or exaggerating.  *Id.*  at 946-947.  She noted that MRIs showed he had pathology in right shoulder and ankle, and an untreated tear in his right knee.  Dr.  Solotaroff opined Garcia was unable to sustain any sort of work, could never use his right upper extremity for overhead reaching, and only rarely use it for reaching in other directions.  She noted he could lift less than five pounds; fine manipulation with his right hand was limited to fifteen to twenty minutes at a time on an occasional basis; and he could not hold his right arm in a fixed position for over fifteen to twenty minutes.  Dr.  Solotaroff further stated Garcia was unable to stand more than thirty minutes and would need to change positions; after sitting for thirty minutes he would need to elevate his leg; sit and stand at will; and rest for two hours a day.  She further noted Garcia was only capable of simple, routine work.  Dr.  Solotaroff stated she believed his problems stemmed from his accident in 2002, and it was reasonable that his limitations have existed since the accident.  *Id.*

17 - FINDINGS AND RECOMMENDATION

1n July, 2008, Dr. Solotaroff noted Garcia had a recent fall and fracture of his left foot. *Id.* at 30-31. She noted he was wearing a CAM boot on the left ankle and had minor swelling. X-rays showed a fracture of the fourth metatarsal neck and transverse comminuted fracture through to the fibula. In August, 2008, Dr. Herzka reported that little could be done surgically to Garcia's right shoulder without high risk of further injury. She noted although there was a rotator cuff tear on his MRI, he did not have cuff complaints and the symptoms had improved. She recommended a further evaluation by Dr. Hayden due to a lesion on the MRI, and continued therapeutic exercises. *Id.* at 965.

## II.    RFC Determination

### A. Medical Opinions

Garcia contends the ALJ erred in rejecting the opinion of Dr. Solotaroff. Social security regulations specify that the most weight is given to the opinions of treating physicians, followed by examining physicians, and the least amount of weight is given to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). An ALJ may reject the opinion of a treating physician if it is controverted by other treating or examining physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002) (citations omitted). The ALJ may reject an uncontroverted opinion by clear and convincing reasons. *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005). The ALJ may also reject physician opinions that are conclusory or not supported by clinical findings. *Id.*

The Commissioner relies on medical and psychological consultants to make findings of fact about the nature of a claimant's impairments and the severity of the functional limitations they

impose. 20 C.F.R. § 416.927(f); SSR 96-6p. However, these reviewing sources do not treat or examine the claimant. The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician. *Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995). It may, however, constitute substantial evidence when it is consistent with other evidence in the record. *Andrews v. Shalala*, 53 F.3d at 1041; *Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir.1989).

The ALJ found the opinion of Dr. Lehtinen, a treating physician, that Garcia may not be able to do his previous work as a landscaper consistent with the record and gave it significant weight. Admin. R. at 46. The ALJ found the November, 2007, opinion of Dr. Solotaroff unpersuasive. *Id.* at 47. She noted the November, 2007, letter from Dr. Solotaroff stated Garcia was not capable of sustaining any activity, even sedentary activity. *Id.* at 46. The ALJ noted Dr. Solotaroff admitted in the letter that she would need to perform a complete medical work up and review of the records before she could opine regarding the duration of Garcia's disability. The ALJ gave little weight to the opinion as Dr. Solotaroff had only treated Garcia for a month. In addition, Dr. Solotaroff's medical notes indicated referrals to specialists, but no acute findings. *Id.* at 47. The ALJ also noted Dr. Solotaroff's opinion was inconsistent with the record regarding Garcia's activities and work activities. *Id.* at 46-47. The ALJ correctly noted that Garcia continued to take occasional strenuous landscaping jobs. *Id.* at 45-47, 267, 270, 272-274, 901. The ALJ gave sufficient legal reasons for rejecting Dr. Solotaroff's opinion.

The ALJ gave little weight to the opinion of Dr. Patrick, a state agency consultant. *Id.* at 46. She noted Dr. Patrick did not base his opinion of mild and moderate mental limitations on any diagnosis. *Id.* The ALJ also found the opinions of the other state agency consultants generally

consistent with the record. However, she found Garcia had more limitations due to his pain complaints. *Id.* at 47.

The ALJ provided sufficient legal reasons supported by substantial evidence in the record for her assessment of the medical evidence. The court must uphold the ALJ's findings, even if evidence exists to support more than one rational interpretation of the evidence. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1193.

### B. Credibility Determination

Garcia asserts the ALJ failed to properly evaluate his testimony regarding his functional limitations. The ALJ must assess the credibility of the claimant regarding the severity of symptoms only if the claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Garcia has medically determinable impairments which could produce some of his symptoms. When there is an underlying impairment and no evidence of malingering, an ALJ may discredit a claimant's testimony regarding the severity of symptoms only by providing clear and convincing reasons based on specific findings. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

In assessing credibility, the ALJ may consider objective medical evidence and the claimant's treatment history. *Smolen v. Chater*, 80 F.3d at 1285. The ALJ found Garcia's assertions of pain and disability inconsistent with information contained in his treatment records. Admin. R. at 45. The ALJ noted specific instances where Garcia's pain complaints were inconsistent with medical examinations and treatment. *Id.* at 45, 691, 709-710, 713, 715-716, 764-765, 850, 867-868, 918.

20 - FINDINGS AND RECOMMENDATION

The ALJ may also employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning his symptoms, and other statements by the claimant that appear to be less than candid. *Smolen v. Chater*, 80 F. 3d at 1284. The ALJ noted that during an examination of Garcia's right shoulder by Dr. Balme, Garcia exhibited marked pain behavior and grimacing. Admin. R. at 45, 867-868. However, Dr. Balme observed no obvious discomfort when Garcia removed and put on his tee-shirt. This behavior is not inconsistent with the record. *See, Id.* at 361, 377, 624-625, 627-628, 630, 646-647, 713, 908-913. Evidence of exaggeration can be used to undermine a claimant's credibility. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Smolen v. Chater*, 80 F.3d at 1284-1285. The ALJ noted Garcia continued to engage in strenuous landscape work, despite being advised against such work. Admin. R. at 45. She also noted Garcia had reported being able to walk for a couple of hours before being bothered by pain; moving furniture; reported he might go out of state for work; and described himself as an off-and-on landscaper on his feet a lot. *Id.* at 45-46, 724-725, 728, 787-788, 901. If a claimant's level and type of activity is inconsistent with his claimed limitations, his activities have a bearing on his credibility. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). The ALJ gave clear and convincing reasons for rejecting Garcia's assertions regarding his inability to do any work. She considered appropriate factors and drew reasonable inferences from substantial evidence in the record in assessing Garcia's credibility. The ALJ's interpretation is not irrational and should be upheld. *Andrews v. Shalala*, 53 F.3d at 1039-1040.

Garcia asserts his RFC should have been at the sedentary level of work rather than the light level of work. However, his RFC contains the functional limitations the ALJ found were supported by substantial evidence in the record. The ALJ is not required to include limitations in an RFC he found neither credible nor supported by the record. *Bayliss v. Barnhart,* 427 F.3d at 1217.

## III. Step Five Determination

The ALJ found Garcia had no past relevant work. Admin. R. at 47. She found Garcia capable of performing a significant range of light work. The ALJ noted if Garcia could perform the full range of light work he would be found not disabled under the Medical-Vocational Guidelines (Guidelines).[2] However, since Garcia has additional limitations, the ALJ stated she was using the Guidelines as a framework for her decision. The ALJ relied on the testimony of a vocational expert (VE), that Garcia could perform work that exists in significant numbers in the national economy. *Id.* at 48, 1009-1011.

The Appeals Council adopted the ALJ's findings with respect to steps one through four of the disability analysis. *Id.* at 16. However, the Appeals Council found a borderline age situation at step five. The Appeals Council determined that as of the date of the ALJ's decision, Garcia was close to a higher age category. The Appeals Council applied the higher age and found it was an adverse vocational factor and deemed Garcia disabled as of April 4, 2008. *Id.*

Garcia argues the Appeals Council should have determined he was disabled as of December, 2004. He cites medical records and a June, 2008, letter from Dr. Solotaroff which was submitted to the Appeals Council. The Appeals Council found this evidence unpersuasive. *Id.* It noted the

---

[2]An individual aged 50-55 with a high school education, limited to light work, whose previous work experience was skilled or semiskilled, and whose skills are not transferable, would be found not disabled. The same individual who was aged 55 or above would be found disabled. 20 C.F.R. Pt. 404, subpt. P, app.2., Rules 202.04, 202.14.

22 - FINDINGS AND RECOMMENDATION

medical records indicated some new injuries that occurred after their finding of disability. *Id.* at 16, 26-31. The Appeals Council also noted continued treatment for previous injuries. The only new findings submitted to the Appeals Council indicated a May, 2008, MRI with findings of a rotator cuff tear in the right shoulder. An August, 2008, exam by specialist Dr. Herzka, found Garcia had full ROM of the right shoulder and recommended he continue his therapeutic exercises. *Id.* at 16, 965.

The Appeals Council adopted the findings of the ALJ regarding the medical evidence and Dr. Solotaroff's opinion and found nothing in the records submitted to the Appeals Council to change that. The ALJ found Dr. Solotaroff's opinion regarding Garcia's limitations unsupported by the medical record and his activities. The more recent medical records from Dr. Solotaroff submitted to the Appeals Council indicate ongoing treatment for previous complaints and referrals to specialists, such as Dr. Herzka. *Id.* at 30-31, 839-840, 954-959. Dr. Solotafoff's letter dated June, 23, 2008, stated Garcia had severe work limitations. 946-947. However, the Appeals Council found Garcia disabled as of April 4, 2008. Dr. Solotaroff's opinion that these limitations may have existed since 2002 was properly rejected by the ALJ's findings and their adoption by the Appeals Council.

## **CONCLUSION**

Based on the foregoing, the Appeals Council decision that Garcia was disabled as of April 4, 2008, is based on correct legal standards and supported by substantial evidence and should be affirmed.

23 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

Based on the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be affirmed.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by April 2, 2010. If objections are filed, any response to the objections are due within 17 days of service of the objections, see Federal Rules of Civil Procedure 72 and 6.*

Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this _15_ day of March, 2010.

MARK D. CLARKE

United States Magistrate Judge